ARLINGTON OIL MILLS, INC., et al.,
Plaintiffs-Appellees,

v.

John A. KNEBEL, Acting Secretary of Agriculture, Defendant-Appellant,

Birdsong Corporation et al., Defendants-Intervenors-Appellants,

Robert W. Moore et al.,
Movants-Appellants.

No. 76–3420.

United States Court of Appeals,
Fifth Circuit.

Nov. 22, 1976.
Rehearing and Rehearing En Banc
Denied Dec. 20, 1976.

observe a perjury prosecution such as guarded against by 11(c)(5).

Robert Pennington, Daniel S. Reinhardt, Frederick E. Link, Atlanta, Ga., for Birdsong Corp., and others.

James H. Bratton, Jr., Jack O. Morse, Donald L. Rickertsen, Atlanta, Ga., for Borden Peanut Co., and others.

Robert E. Kopp, Thomas G. Wilson, Appellate Sec., Civ. Div., Dept. of Just., Washington, D. C., John A. Harris, Office of the General Counsel, U. S. Dept. of Agriculture, Washington, D. C., Jesse G. Bowles, Cuthbert, Ga., Greg J. Leonard, Asst. U. S. Atty., Macon, Ga., for movant.

D. R. Cumming, Jr., Bennett L. Kight, Carey P. DeDeyn, Atlanta, Ga., Albert W. Stubbs, Columbus, Ga., for Arlington Oil Mills, and others.

Denmark Groover, Jr., Frank H. Childs, Jr., Macon, Ga., for H. Emmett Reynolds.

Before COLEMAN, CLARK and TJOFLAT, Circuit Judges.

CLARK, Circuit Judge:

Defendant, the United States Secretary of Agriculture, and defendant-intervenors, individual and corporate peanut growers and shellers,[1] appeal from the district court's preliminary injunction order which (1) prohibited the Secretary from implementing the amended peanut price support differential program announced on July 6, 1976 and (2) mandated the Secretary to implement the peanut price support differential program[2] as originally announced on March 19, 1976. On September 10, 1976, we stayed the preliminary injunction, provided that the United States made it possible for peanut growers to receive peanut price support loans under an interim peanut price support differential program offered by the government.[3] The provision was complied with and the case is now before us on the merits of the appeal. We hold that the district court correctly concluded that the Secretary's March 19 announcement of 1976 price differentials was validly adopted under the Administrative Procedure Act, 5 U.S.C. §§ 551 et seq. and that the Secretary's July 6 announcement was defective because of its procedural inadequacies; however, the district court erred in ordering the Secretary to implement the March 19 announcement. The district court should have remanded the cause to the Secretary with directions to adopt a new program

---

1. Defendant-Intervenors include Birdsong Corporation, the Columbian Peanut Company, Gillam Brothers Peanut Sheller, Inc., Hancock Peanut Company, National Peanut Corporation, Parker Peanut Company, Pond Brothers Peanut Company, Severn Peanut Company, Peanut Processors, Inc., Marshall Grant, from the Virginia-Carolinas region; and Birdsong Corporation, Borden Peanut Company, Brady Mills, Inc., DeLeon Peanut Company, Dennison Peanut Company, Ellis L. Ganey Peanut Company, Lee County Peanut Company, Portales Valley Mills, Inc., Quality Peanut Company, Shell Peanut Company, Wilco Peanut Company, The Clint Williams Company, Woldert Peanut Company and Dee Keeton, from the Southwest (Texas, Oklahoma, and New Mexico). Although these two sets of interested parties intervened separately in the court below and are separately represented by counsel, they are jointly prosecuting the instant appeal.

2. The plaintiffs, growers and shellers in Georgia, Florida, and Alabama, who sought the preliminary injunction below, are Arlington Oil Mills, Inc., The Blakely Peanut Company, Dothan Oil Mill Company, Farmers Fertilizer & Milling Company, Houston Peanut Company, McClesky Mills, Inc., Pender Peanut Corporation, Sessions Company, Damascus Peanut Company, Farmers Gin & Warehouse Company, Fudge Gin Company, Gray Storage and Dryer Company, LeeCo Farm Center, Inc., Alabama Warehouse Company, and J. R. Odum.

3. The stay order which was immediately effective provided that

within 10 days from the date of this Order the Commodity Credit Corporation makes loans available to producers of peanuts on an interim basis utilizing for each type of peanut the lower of the differentials announced March 19 or July 6 for that type of peanut, such loans to be made on the basis of the announced level of price support, i. e., 75% of the parity price for peanuts at the beginning of the marketing year adjusted by the interim differential applicable to the type of peanuts offered. Appropriate payments adjusting such loans to reflect whatever differentials may ultimately be in effect may be made after the dispute has been resolved.

utilizing procedures which complied with the Administrative Procedure Act.

With the intent of providing stable economic conditions throughout the peanut industry and protecting producers, handlers, processors, and consumers of peanuts, Congress provided that peanut farmers who comply with acreage limitations on production are eligible to receive price supports for peanuts produced on their regulated acreage. 7 U.S.C. §§ 1281 *et seq.* The actual price support payable to a particular farmer in a given year depends upon determinations and calculations by the Secretary of a number of complex variables in accordance with formulas provided by this legislation.[4]

The Secretary's determination which is key to the resolution of the case at bar is that he is permitted to make appropriate adjustments in the price support program under 7 U.S.C. § 1423. This section allows him to make appropriate adjustments in the support price for any commodity on account of differences in grade, type, staple, quality, location, and other factors. Insofar as practicable the statute requires any such adjustments to be made in such manner that the average support price for the commodity will equal the level of support provided by the act. The Secretary has traditionally made these adjustments, known as "differentials," for peanuts on the basis of the following types: Virginia, Runner, Southeast Spanish, Southwest Spanish, and Valencia.[5] The differentials also take into account variations in grade and condition of each type of peanut. Since 1972, the Secretary has followed the informal rulemaking procedures of the Administrative Procedure Act, 5 U.S.C. §§ 551 *et seq.* prior to announcing peanut differentials.[6] The statutory scheme expressly requires the Secretary, insofar as practicable, to announce "the level of price support" for peanuts prior to the planting season. 7 U.S.C. § 1426. No similar time stricture is mandated in connection with the determination of adjustments or "differentials" under 7 U.S.C. § 1423.

The funding of price supports is provided by the Commodity Credit Corporation (CCC), through loans, purchases, payments, or other means. Ordinarily, a covered farmer delivers his peanuts to a warehouse having a storage contract with a grower cooperative association and receives a draft for the peanuts' price support value. As these drafts are paid, the CCC lends money to the association in amounts equal to the drafts, the loans being secured by warehouse receipts which represent peanuts received by the association from the farmers. Peanuts may then be sold by the CCC for the association's account or by the association pursuant to a minimum sales policy

---

4. For example, "parity price" is defined by 7 U.S.C. § 1301(a). The "price support level" is to be determined by use of the "parity price" in a formula prescribed by 7 U.S.C. § 1441(b); however, the Secretary is authorized to announce a price support program over the statutory minimum provided by 7 U.S.C. § 1441(b) upon considering the following factors set forth in 7 U.S.C. § 1421:

(1) the supply of the commodity in relation to the demand therefor, (2) the price levels at which other commodities are being supported, . . . (3) the availability of funds, (4) the perishability of the commodity, (5) the importance of the commodity to agriculture and the national economy, (6) the ability to dispose of stocks acquired through a price-support operations, (7) the need for offsetting temporary losses of export markets, (8) the ability and willingness of producers to keep supplies in line with demand . . . .

5. Virginia peanuts are primarily grown in the Virginia and Carolinas region of the country. Runners are grown in the Southeast (Alabama, Florida, and Georgia). The Spanish and Valencia varieties are principally grown in the Southwest (New Mexico, Oklahoma, and Texas).

6. The Secretary's determination of a price support program is arguably exempt from the rulemaking requirements of the APA under 5 U.S.C. § 553(a)(2). See *Stroud v. Benson,* 155 F.Supp. 482, 490–91 (E.D.N.C.1957), *vacated on other grounds,* 254 F.2d 448 (4th Cir.), *cert. denied,* 358 U.S. 817, 79 S.Ct. 28, 3 L.Ed.2d 59 (1958). The Department of Agriculture has voluntarily agreed to comply with the APA in such matters, 36 Fed.Reg. 13804 (July 24, 1971), however, and concedes that it is bound by its regulation and must comply with the APA. *See Rodway v. Department of Agriculture,* 168 U.S.App.D.C. 387, 514 F.2d 809 (1975).

approved by the CCC. The farmer-members of cooperatives which thus obtain price support funds share on a pro rata basis any profit the association may earn.

From 1971 through 1975, the "differentials" fixed by the Secretary remained constant.[7] Under these prior announcements, the average price support for Runners was higher than other peanut varieties. In January of 1976, the Department of Agriculture scheduled a meeting for February 23, 1976, to discuss the 1976 peanut differentials and sent notice of the meeting to peanut industry representatives, inviting their attendance and comments. Prior to the February 23 meeting, the Tobacco and Peanut Division of the Department of Agriculture conducted an analysis of available technical information and prepared several alternative proposals for 1976 differentials. At the February 23 meeting, officials of the Tobacco and Peanut Division proposed a differential program under which the average Virginia support prices would be approximately $30 higher than Runner support prices. The Division's proposed departure from differential programs of preceding crop years intended to encourage the increased production of Virginia peanuts and to discourage production of Runners peanuts. In the prior year, Runners had represented over 90 percent of the surplus purchases made by the CCC. At the February 23 meeting, all parties presented their views and comments concerning 1976 differentials in general and specifically with respect to the Division's proposal. Representatives from Virginia and the Carolinas and from the Southwest opposed the Division's proposal, arguing that the proposed changes would price their peanuts out of the market and would encourage surplus sales of their peanuts to the CCC. Representatives of the Southeast supported a change similar to the Division's proposal. Following the meeting, interested parties were given 2 weeks within which to submit additional written comments. On March 19, 1976, the Department of Agriculture issued a press release announcing that the 1976 Virginia differential would be 5 percent higher than Runners and that the Spanish differential would be 2.5 percent higher than Runners.[8]

Following the March 19 differential announcement, farmers and shellers from the Virginia-Carolinas and the Southwest protested the Department of Agriculture's decision to the then Secretary of Agriculture Earl Butz and Assistant Secretary of Agriculture for Commodity Programs Richard E. Bell. Representatives of the Virginia-Carolinas area met with both Secretary Butz and Assistant Secretary Bell during April, arguing that the March 19 differentials would not encourage production of Virginia peanuts but would instead cause a substantial encroachment by Runners on the private market which had developed for Virginia Peanuts. After these meetings, although Assistant Secretary Bell had conferred with officials in the Department's Tobacco and Peanut Division about the March 19 differentials, representatives of

---

7. For example, the average differentials for the 1975 peanut crop were:

| Type: | Dollars per ton |
|---|---|
| Virginia | 393.80 |
| Runner | 399.20 |
| Southeast Spanish | 384.93 |
| Southwest Spanish | 380.71 |
| Valencia, in the Southwest area suitable for cleaning or roasting | 393.80 |

7 C.F.R. 1446.11 (1976).

8. In the Department's March 19, 1976 press release, the effect of the newly adopted differentials (with $411.15 per average quality ton being used as an hypothetical peanut price support level) were illustrated as follows:

| Type: | Dollars per ton |
|---|---|
| Virginia | 422.09 |
| Runner | 410.19 |
| Southeast Spanish | 403.79 |
| Southwest Spanish | 400.76 |
| Valencia, in the Southwest area suitable for cleaning or roasting | 422.09 |

growers and shellers from the Southeast were consistently being assured by other Department officials that no change in the March 19 differentials was contemplated and these differentials would be in effect for the 1976 peanut crop. One member of the southeastern group wrote Assistant Secretary Bell and offered to provide any additional information which the Department might wish to have if it were reviewing the March 19 announcement. Mr. Bell never responded to this offer.

After a review of the data upon which the March 19 differentials were based, Assistant Secretary Bell determined that the March 19 differentials would not increase the production of Virginia peanuts, as was intended, and that in fact the price of Virginia peanuts was raised so high that it would be difficult for Virginia peanuts to maintain their previously developed share of the private market, which was inconsistent with Secretary Butz's basic policy of developing free markets rather than government markets. In mid-April of 1976, Assistant Secretary Bell urged Secretary Butz to return to the 1975 differentials. A final decision on the matter was delayed, however, when the Secretary left on a trip abroad. Meanwhile, influential congressmen representing growers and shellers from the Southeast, the Virginia-Carolinas, and the Southwest exerted political pressure upon the Department of Agriculture either to change or refrain from changing the differentials as they felt was most advantageous to their particular constituency. When Secretary Butz returned from abroad, he concurred in the recommendation of Assistant Secretary Bell. At that same time, other Department officials were still assuring Southeastern representatives that the March 19 differentials remained in effect.

On July 6, 1976, a Department press release revoked the March 19 differential and announced that the differentials for the 1976 peanut crop would be the same as those for the 1971–1975 period. At no time was the July 6 announcement preceded by notice from the Department to the peanut industry at large that it was contemplating a rescission of the March 19 differentials. The Department neither requested any comment from the industry in general, nor did it conduct any hearings or meetings and receive the views and proposals of interested parties with respect to any such change (except for such meetings as it had with interested congressmen).

On July 23, 1976, the United States District Court for the Middle District of Georgia granted the plaintiffs, southeastern growers and shellers, a temporary restraining order against the Department of Agriculture's enforcement of its July 6 announcement, based upon plaintiffs' allegations that their representatives had been precluded from participating in the July 6 decision in contravention of the APA's informal rulemaking procedures.

On August 9, 1976, the Department of Agriculture announced the 1976 parity price for peanuts and further announced that no peanut price support loans on the basis of price differentials would be available through the CCC until further notice. On August 30, 1976, the district court entered its preliminary injunction of the July 6 announcement, finding that the July 6 differentials were procedurally defective because no public participation as is required by the APA had taken place in connection with them. The court further ordered the Secretary to implement its March 19 differentials announcement which the court found had been validly adopted under the Administrative Procedure Act and was neither arbitrary nor capricious. Because it found the 1976 planting and marketing seasons were well advanced, the court declined to remand the cause to the Secretary to initiate new informal rulemaking procedures and determine a new set of peanut differentials.

On September 10, 1976, this court, on motion of the Department of Agriculture and the defendant-intervenors, stayed the lower court's preliminary injunction and order, provided that within 10 days of our stay, peanut growers and shellers could receive CCC loans under an interim peanut

price support differential program ordered by this court.[9]

On this appeal, the thrust of the defendants' triple-barrelled attack is (1) that the Department's July 6 announcement was validly adopted and therefore the lower court erred in enjoining the Secretary from enforcing that announcement; (2) that, assuming *arguendo* the July 6 announcement was invalidly adopted, it necessarily follows that the March 19 announcement is also invalid since the Department followed essentially the same procedures in reaching both decisions, thus the lower court erred in mandating that the March 19 announcement be applied by the Secretary to the 1976 peanut crop; (3) that, assuming *arguendo* the lower court's findings as to both announcements was correct, its preliminary injunction and order were error, and the district court abused its discretion in not remanding the cause to the Department so that it could adopt new peanut differentials in compliance with the Administrative Procedure Act.[10] These arguments will be treated separately below.

At the outset, we note that both announcements are within the ambit of the APA's definition of a "rule." Accordingly, the Department was exercising its informal rulemaking powers rather than its adjudicatory powers in promulgating both of these announcements, and we review both proceedings in that context.[11]

*The July 6 Announcement*

The district court set aside the Department's July 6 announcement on the grounds that the Department reached its decision through a "fundamentally unfair procedure . . . characterized by a failure to dis-

close to interested parties what views and data were being submitted to the Department and denying them the opportunity to respond effectively to those views" in direct contravention of the requirements of the APA. In arguing that this finding was erroneous, the Department correctly describes informal rulemaking as a consultative process which permits a Government agency to educate itself and which prevents interested parties from restricting the scope of inquiry to relatively narrow issues. The Department urges that its July 6 decision was simply a reconsideration of its March 19 announcement, thus the plaintiffs had already had adequate notice and an opportunity to be heard prior to the March 19 announcement. It argues that the July 6 decision was determined in conformity with applicable APA requirements in that all interested parties had equal access to the Department during its reconsideration of the July 6 decision. Yet the Department's authority for this argument refutes the proposition asserted. In *Aeronautical Radio, Inc. v. United States*, 335 F.2d 304, 308 (7th Cir. 1964), *cert. denied*, 379 U.S. 966, 85 S.Ct. 658, 13 L.Ed.2d 559 (1965), the United States Court of Appeals for the Seventh Circuit expressly noted that the Federal Communications Commission, in reconsidering its May 6, 1963 Order prescribing fees for applications for licenses to use the public air waves for radio purposes, had fully complied with the APA by "inviting and considering the comments and petitions for reconsideration before putting [its subsequent October 7, 1963 Order] into effect."

In the present case the Department concedes that the rulemaking requirements of the APA are applicable to its determinations of peanut price support dif-

---

9. See note 3 *supra*. The proviso in the order was based upon a tender of such loan implementation by the Secretary on behalf of the CCC.

10. All parties devoted a goodly portion of their appellate briefs to the argument of whether the July 6 announcement was invalid because the Department was improperly influenced by political pressures exerted by Congressmen from

Districts in which interested representatives of the peanut industry, both farmers and shellers, reside. Since the lower court expressly noted that its decision was not based on the absence or presence of allegedly improper political pressures, we do not deal with these arguments on appeal.

11. See note 6 *supra*.

ferentials.[12] When the Department issued its March 19 press release concerning peanut differentials for the 1976 crop year, it had made a determination which was "final and conclusive" under 7 U.S.C. § 1429. Any further consideration by the Department of whether to alter this final decision fell within the APA's definition of rulemaking: an "agency process for formulating, amending, or repealing a rule," 5 U.S.C. § 551(5), and the rulemaking procedures of the APA fully applied to the Department's determination of its July 6 announcement. 5 U.S.C. § 553. Accordingly, the duties imposed upon the Department under the APA in relation to the July 6 announcement were not complied with merely because the Secretary had fulfilled his APA obligations in relation to the March 19 announcement. The district court correctly concluded that the Secretary was required to provide adequate notice that reconsideration was underway and to give all interested persons a reasonable opportunity to participate and present their views before he arrived at the July 6 announcement. 5 U.S.C. § 553(b), (c).

■ Taking a different tack, defendant-intervenors argue that plaintiffs had actual notice that the March 19 announcement was being reconsidered and actively participated in its reconsideration and therefore APA procedures were not violated in reaching the July 6 decision. 5 U.S.C. § 553(b), (c). The authority which supports their "actual notice" argument, however, deals uniformly with cases in which a party who has participated in an administrative proceeding seeks to take advantage of some technical default on the part of the administrative agency involved, under circumstances where no prejudice to the objecting party's opportunity to know about and to participate in the proceeding has resulted. *See, e.g., Air Line Pilots Ass'n v. Civil Aeronautics Board*, 215 F.2d 122, 124 (2d Cir. 1954); *Florida Citrus Commission v. United States*, 144 F.Supp. 517, 521 (N.D.Fla.1956). The defendant-in-

tervenors' contention totally misses the import of the lower court's holding. After the Virginia-Carolina representatives first protested the March 19 decision, plaintiffs thought that reconsideration might be undertaken. In an effort to learn the truth, they made numerous inquiries as to the status of the Department's March 19 announcement. In this sense the plaintiffs had actual notice that the Department might reconsider the March 19 differentials. Department officials' repeated assurances that the March 19 announcement would remain in force, however, effectively prevented the plaintiffs' participation in the decisionmaking process either by offering evidence supportive of its own position or in rebuttal to any contrary positions, in direct contravention to 5 U.S.C. § 553(c). Accordingly, the district court was correct in its conclusion that the July 6 announcement was defective because of APA procedural inadequacies.

*The March 19 Announcement*

■ In upholding the March 19 announcement, the district court found that this decision was reached "in conformity with the statutory requirements and after a full and fair opportunity for all interested parties to submit information and assert their views." The Secretary now argues that because it was not published in the *Federal Register* his March 19 announcement never was legally effective. This belated self-effacement is unavailing. The lack of formal publication does not preclude the effectiveness of an otherwise valid agency action. In *United States v. Aarons*, 310 F.2d 341, 348 (2d Cir. 1962), the United States Court of Appeals for the Second Circuit rejected a similar contention, holding that the failure of APA required *Federal Register* publication is without consequence to a person having actual knowledge of the agency's actions. Here the industry had actual notice of the Department's February 23, 1976 meeting to discuss the adoption of 1976 peanut price support dif-

---

12. 5 U.S.C. § 552(a)(1)(D). Also, the announcement was not accompanied by a concise, general statement of the basis and pur-

pose of the rule. 5 U.S.C. § 553(c); *see Florida Sugar Cane League, Inc. v. Usery*, 531 F.2d 299, 303 (5th Cir. 1976).

ferentials. 5 U.S.C. § 553(b). No contention is made that any person was not given a full, fair opportunity to participate in the rulemaking process. 5 U.S.C. § 553(c). Indeed, everyone who is a party here well knew the content of the March 19 announcement. Accordingly, neither the Department's failure to publish its March 19 announcement in the *Federal Register* nor its failure to publish a basis and purpose statement render the announcement ineffective as to the parties in this litigation. *NLRB v. Chelsea Cook Co.,* 411 F.2d 189, 191 (1st Cir. 1969); *Kessler v. FCC,* 117 U.S.App.D.C. 130, 326 F.2d 673, 689–90 (1963); *United States v. Aarons,* 310 F.2d 341, 347–48 (2d Cir. 1962).

The defendant-intervenors argue that the district court's treatment of the Department's two announcements is inconsistent and that either both must stand or both must fall as all parties had actual notice and an opportunity to participate in the rulemaking process in both instances. This argument has merit only if the procedures utilized by the Department in reaching its decision to make the reconsidered announcement were substantially similar to those involved in reaching its initial decision. It would be meaningless to require notice and a reasonable opportunity to participate in rulemaking, if after announcement of a rule, the agency could closet its intent to reconsider and completely undo the rule first made.

Our recitation of the events preceding the Department's two announcements, however, clearly demonstrates that we are not confronted with choosing between Tweedledee and Tweedledum. The simple answer to the defendant-intervenors' argument is that the March 19 announcement was determined in conformity with the APA with all interested parties having adequate notice and a full, fair opportunity to submit information and assert their views while the July 6 announcement was not.

*The Mandamus to Implement the March 19 Announcement*

The district court's order provided:

[In] framing an appropriate remedy in this matter the Court must take into consideration the practicalities of the situation. Peanuts have already begun to move to market in substantial quantities. In these circumstances it is neither feasible nor appropriate to remand the matter to the Secretary to consider—in the middle of the marketing season—differentials which were clearly intended to be determined and announced (and which were validly determined and announced) *before* the planting season.

As has been above noted the Agricultural Act contemplates that the Secretary will make an early announcement of support levels and that farmers and processors will plan on the basis of that announcement. Immediate implementation of the March 19 announcement will eliminate the uncertainty which would otherwise interfere with the orderly marketing of the 1976 crop and would have the additional virtue of assuring that statutory policies are not frustrated by multiple announcements of price support levels. (Emphasis in the original.)

The Secretary argues that if his July 6 announcement is procedurally defective, the only appropriate remedy is to remand the matter to him. He urges that the mandate to implement the March 19 announcement prevented him from exercising the discretionary authority to make "appropriate adjustments . . . in the support price" for peanuts which Congress provided. 7 U.S.C. §§ 1423, 1429. The defendant-intervenors additionally argue that the district court's order should be set aside because the March 19 announcement was arbitrary and capricious and has been determined by the Secretary to have been improvidently issued. Plaintiffs urge us to uphold the district court's injunction on the ground that (1) the procedural and substantive validity of the March 19 announcement, and (2) exigent circumstances at the time of court action, *i. e.,* the planting season had long past, and peanuts were beginning to move to market, combine to demonstrate that the district court's exercise of its equity power was not an abuse of discretion.

The congressional scheme is clear. The "Secretary shall provide the price support authorized." 7 U.S.C. § 1421. A determination as to whether "appropriate adjustments . . . in the support price for any commodity" may be necessary is discretionary with the Secretary. 7 U.S.C. § 1423. Such a determination, if made, is "final and conclusive." 7 U.S.C. § 1429.

The underlying premise of the portion of the district court's opinion implementing the Secretary's March 19 announcement was that the lateness of the date by which the Secretary had acted and the case had reached litigation rendered it statutorily and pragmatically impossible for the Secretary to conduct further hearings and make a new differential announcement.

■ This premise is inconsistent with the plain language of 7 U.S.C. § 1423 and 7 U.S.C. § 1426. Section 1423 contains no provision as to the time of deciding whether adjustments will be announced. Section 1426 provides in pertinent part: "The Secretary shall, *insofar as practicable*, announce the level of price support for field crops in advance of the planting season . . . . . (Emphasis added.)" The statutory scheme and the legislative history of the Agricultural Act of 1949 clearly contemplate that the Secretary's price support announcement will be made prior to the planting season and prior to the time the economic impact of the announcement would be felt in the market place. *See* 1949 *U.S.Code Cong.Serv.*, pp. 2407, 2410, 2413.

Because different types of peanuts are grown in various sections of the United States, the economic impact of announcements adjusting support prices by types of peanuts have substantially the same impact in each locality as the announcement of a price support level for a single-type crop such as cotton. Thus considered, the Secretary should adjust price support levels between the different type crops in advance of planting or marketing commitments insofar as it is practicable to do so. For the past 5 years, however, the Secretary's pea-

nut differential announcements have not been issued until well after the planting season was complete.[13] The Secretary's July 6 announcement, albeit procedurally defective under APA standards, was not inconsistent with the Department's prior policies in relation to the time of peanut differential announcements.

More significantly, the statutory status of the matter is clear. Neither the procedural invalidity of the July 6 announcement nor the procedural propriety of the March 19 announcement warranted the total displacement by the court of the Secretary's function. Without reference to time, Congress has placed it within the Secretary's prerogative to determine whether he will change the March 19 announcement or allow it to stand. If it is claimed that the procedures and practices he adopted, though consistent with the statute, have caused economic dislocations within the peanut industry, it is for the legislative and not the judicial branch to effect corrections.

■ The Secretary's final and conclusive authority to determine peanut price support levels and differentials should not have been displaced in this case. Under existing legislation, the district court lacked authority to mandate that the March 19 differentials be implemented. The lower court's correct adjudication of procedural impropriety in the July 6 announcement does not foreclose the Secretary from discharging his statutory duty to determine whether further adjustments are required. The cause must be remanded so that the Secretary may set peanut price support differentials for the 1976 crop in compliance with APA procedures. *United Gas Improvement Co. v. Continental Oil Co.*, 381 U.S. 392, 406, 85 S.Ct. 1517, 14 L.Ed.2d 466 (1965); *McBride v. Smith*, 405 F.2d 1057 (2d Cir. 1968).

The cause is remanded to the district court with directions to remand to the Secretary with directions to fix proper differentials for the 1976 peanut crop. The parties should be invited to stipulate, if they

---

**13.** Differentials for 1975 were announced on July 7; for 1974, on May 23; for 1973, on June 13; for 1971, on June 2, of these respective years.

can, the minimum reasonable time within which APA procedures can be followed, and a proper decision made. If no stipulation can be reached, the district court may consider fixing guidelines to govern procedural and decisionmaking times by the Secretary to assure the promptest possible resolution of such differentials, consistent with the rights of the parties and public and the making of a just decision.

The interim program issued by this court on September 10, 1976, shall remain in force pending final resolution of the matter or further order of this court.

VACATED AND REMANDED.