**Miguel MADA–LUNA, Petitioner-Appellee,**

v.

**Eugene M. FITZPATRICK, Acting District Director, Immigration & Naturalization Service, Respondent-Appellant.**

No. 84–1988.

United States Court of Appeals, Ninth Circuit.

Argued May 17, 1985.

Submitted Dec. 10, 1985.

Decided March 30, 1987.

A. Melvin McDonald, Richard K. Willard, Barbara L. Herwig, John M. Rogers, Washington, D.C., for respondent-appellant.

Antonio D. Bustamante, Tucson, Ariz., for petitioner-appellee.

Before TANG and FLETCHER, Circuit Judges, and HILL,* District Judge.

FLETCHER, Circuit Judge:

Eugene Fitzpatrick, an acting district director of the Immigration and Naturalization Service (INS), appeals from the district court's order directing him to reconsider Miguel Mada-Luna's application for deferred action status under INS Operating Instruction 103.1(a)(1)(ii). The district court ruled that Fitzpatrick improperly reviewed Mada's application under the 1981 version of the Operating Instruction.[1] The

---

* Honorable Irving Hill, Senior United States District Judge, Central District of California, sitting by designation.

1. The 1981 version of Operating Instruction 103.1(a)(1)(ii), which the INS promulgated to take effect May 6, 1981, provides that:

> The district director may, *in his discretion,* recommend consideration of deferred action, *an act of administrative choice* to give some cases lower priority and *in no way an entitlement,* in appropriate cases.
>
> The deferred action category recognizes that the Service has limited enforcement resources and that every attempt should be made administratively to utilize these resources in a manner which will achieve the greatest impact under the immigration laws. In making deferred action determinations, the following factors, among others, should be considered:
> (A) the likelihood of ultimately removing the alien, including:
> (1) likelihood that the alien will depart without formal proceedings (e.g., minor child who will accompany deportable parents);
> (2) age or physical condition affecting ability to travel;
> (3) likelihood that another country will accept the alien;

> (4) the likelihood that the alien will be able to qualify for some form of relief which would prevent or indefinitely delay deportation;
> (B) the presence of sympathetic factors which, while not legally precluding deportation, could lead to unduly protracted deportation proceedings, and which, because of a desire on the part of the administrative authorities or the courts to reach a favorable result, could result in a distortion of the law with unfavorable implications for future cases;
> (C) the likelihood that because of the sympathetic factors in the case, a large amount of adverse publicity will be generated which will result in a disproportionate amount of Service time being spent in responding to such publicity or justifying actions;
> (D) whether or not the individual is a member of a class of deportable aliens whose removal has been given a high enforcement priority (e.g., ... narcotic drug traffickers ... habitual immigration violators).

Operating Instruction 103.1(a)(1)(ii) (1981) (emphasis added).

court held the 1981 instruction invalid because the INS promulgated it without the notice-and-comment procedures required by the Administrative Procedure Act (APA), 5 U.S.C. § 553(b)-(d) (1982), and without publishing it in the Federal Register, as required by the Freedom of Information Act (FOIA), 5 U.S.C. § 552(a)(1)(D)-(E) (1982). The district court ruled that, as a result, the original, 1978 version of the Operating Instruction was never validly superseded, and that Fitzpatrick was required to review Mada's application under its more "generous" standard.[2] The court therefore granted Mada's habeas petition and remanded his application to the INS. Fitzpatrick appeals. We have jurisdiction under 28 U.S.C. § 1291 (1982).

In light of our recent decision in *Romeiro De Silva v. Smith*, 773 F.2d 1021 (9th Cir.1985), issued after the district court's decision, we must reverse and remand. We reject Mada's claim that the INS's promulgation of the 1981 version of the Operating Instruction violated the notice-and-comment requirements of the APA, because the amended Operating Instruction qualifies under the APA's exception for "general statements of policy." We also reject Mada's claim that the application of the 1981 Instruction in his case violated the FOIA's publication requirements. Therefore, we conclude that the district court

---

2. The original, 1978 version of Operating Instruction 103.1(a)(1)(ii), which became effective September 20, 1978, provides that:

*In every case* where the district director determines that adverse action would be unconscionable or result in undue hardship because of the existence of appealing humanitarian factors, he *shall recommend* consideration for deferred action category. His recommendations shall be made to the regional commissioner concerned.... Interim or biennial reviews should be conducted to determine whether approved cases be continued or removed from deferred action category.

When determining whether a case should be recommended for deferred action category, consideration should include but not be limited to the following: (1) advanced or tender age; (2) number of years presence in the United States; (3) physical or mental condition requiring care or treatment in the United States; (4) family situation in the United States—effect of expulsion; (5) criminal, immoral or subversive activities or affiliations—recent conduct. If the district director's recommendation is approved by the regional commissioner the alien shall be notified that no action will be taken by the Service to disturb his immigration status, or that his departure from the United States has been deferred indefinitely, whichever is appropriate.

Operating Instruction 103.1(a)(1)(ii) (1978) (emphasis added).

The focus of the 1978 version of the Operating Instruction is thus significantly different from that of the 1981 version. The 1981 version is concerned first and foremost with the effect of deporting or excluding a particular alien upon the administration, management, and public image of the INS: it requires the district director to evaluate such factors as the "likelihood of ultimately removing the alien," the possibility that deportation proceedings will become "protracted" or that the law will be "distort[ed]," the likelihood of "adverse publicity" that will re-

quire a time-consuming response by the INS, and the "enforcement priority" given to the particular alien in question. In contrast, the 1978 version focusses upon the effect of deportation or exclusion upon the individual alien himself: it requires the district director to consider such issues as the potential "unconscionab[ility]" or the "undue hardship" that may result to the alien, his age and length of stay in the United States, his physical and mental condition and family situation, and his other recent conduct.

Because of these differences in the two versions of the Operating Instruction, our court has held that they differ in the extent to which they establish judicially enforceable rights. We held in *Nicholas v. INS*, 590 F.2d 802 (9th Cir.1979), that "rather than merely providing internal procedural guidelines to the INS," the 1978 version of the Operating Instruction established a judicially enforceable right for deportable and excludable aliens applying for deferred action status to have their applications reviewed on an equal basis with those of similarly-situated applicants, and held that aliens' claims based on the 1978 Operating Instruction must be reviewed by courts under the abuse-of-discretion standard. *Romeiro De Silva v. Smith*, 773 F.2d 1021, 1024–25 (9th Cir.1985); *Nicholas*, 590 F.2d at 807–08. In contrast, we recently held that based upon the new language in the 1981 Operating Instruction, "'it is no longer possible to conclude that [the Instruction] is intended to confer any benefit upon aliens, rather than [to operate] merely for the INS's own convenience,'" and concluded that courts have no jurisdiction to review denials of applications for deferred action status under the 1981 Instruction. *Romeiro*, 773 F.2d at 1024 (quoting *Wan Chung Wen v. Ferro*, 543 F.Supp. 1016, 1018 (W.D.N.Y.1982)). Thus, the resolution of which version of the Operating Instruction is applicable in Mada's case will determine whether or not he has a right to judicial review and may affect his entitlement to deferred action status.

had no authority to overturn Fitzpatrick's decision.

## FACTUAL BACKGROUND

Mada is a Mexican alien, convicted in 1981 for a narcotics violation. He was incarcerated for one year and then paroled. When he was released, the INS initiated deportation proceedings against him based upon his conviction, and he was ordered deported in 1983. Mada then applied to Fitzpatrick, as the acting district director, for deferred action status under the 1978 version of Operating Instruction 103.-1(a)(1)(ii). Fitzpatrick denied the application in November, 1983, and in December, 1983, denied a supplemental application.[3]

To support his application for deferred action, Mada stated that he had resided in the United States for seventeen years, and had no criminal record other than his single narcotics conviction. He submitted letters from prison officials and his parole officer characterizing him as a model prisoner and an outstanding parolee. Moreover, Mada stated that between the time of his narcotics arrest and trial, he had worked as an undercover operative for the United States Drug Enforcement Agency (DEA), and furnished evidence that this involvement has subjected him and his family to significant danger. While working for the DEA in Sonora, Mexico, Mada and his wife allegedly were kidnapped by drug traffickers, held at gunpoint, and released only when they promised to pay a ransom of about $20,000. According to Mada, he has not paid the ransom, and has, as a result, received a series of telephone calls from Mexico threatening his life if he returns there, several of which he transcribed and submitted to the INS. Finally, Mada indicated in his applications that both his wife and daughter are United States citizens.

Fitzpatrick rejected both of Mada's applications for deferred action status, concluding that besides his narcotics conviction, Mada had been "a habitual violator of the Immigration laws" and had lied to the INS under oath on at least two occasions. Furthermore, Fitzpatrick concluded, based on the evidence presented to him, that the death threats against Mada did not result directly from his work for DEA, but instead were made by his former criminal associates who are now seeking repayment for the narcotics seized from Mada when he was arrested in 1981. For all these reasons, Fitzpatrick chose not to defer action on Mada's deportation.

Mada initiated the present action for habeas relief in district court. The court granted his petition, concluding that application of the 1981 Operating Instruction in Mada's case violated the APA and FOIA. The court remanded Mada's case to the INS for consideration of his deferred action application pursuant to the original, 1978 Operating Instruction.

## ANALYSIS

Mada's challenge to Fitzpatrick's denial of his application for deferred action status focuses exclusively upon the *validity* of the 1981 Operating Instruction and its *applicability to his petition.* Mada contends that the 1981 Operating Instruction was never validly promulgated because of the INS's failure to comply with the APA's notice-and-comment requirements and the FOIA's publication requirements, and that it therefore never validly superseded the original, 1978 Operating Instruction. He maintains that as a result, he is entitled to have his petition reviewed under the 1978 Operating Instruction, and that based upon our decision in *Nicholas v. INS,* 590 F.2d

---

**3.** In denying Mada's two applications for deferred action status, Fitzpatrick did not explicitly cite either the 1978 version or the 1981 version of the Operating Instruction. His denial of Mada's initial application, dated November 2, 1983, contained terms such as "appealing humanitarian factors" and "unconscionab[ility]," which are part of the standards provided in the 1978 version. However, his denial of Mada's supplemental application, dated December 22,

1983, referred to Mada as "a habitual violator of the Immigration laws," which is a factor to be considered under the 1981 version, and focussed on the question of whether Mada's situation was "sympathetic," which would be consistent with the 1981 version. Fitzpatrick has maintained throughout this action that he applied the 1981 Operating Instruction in evaluating Mada's petition, and Mada does not dispute this representation.

802 (9th Cir.1979), he is entitled to judicial review of that determination. *See* footnote 2, *supra*.

Mada does not challenge the manner in which Fitzpatrick applied the 1981 Operating Instruction in his case or the decision that Fitzpatrick reached based upon it. Mada conceded at the district court that he would have "no claim of entitlement nor substantive rights" if the 1981 Operating Instruction applied to his petition. Moreover, any challenge to the merits of Fitzpatrick's determination under the 1981 Operating Instruction would be foreclosed by our decision in *Romeiro*, where we held that courts have no authority to review denials of deferred action status petitions under the 1981 version of the Instruction. *See Romeiro*, 773 F.2d at 1024–25; *see also* 5 U.S.C. § 701(a)(2) (limiting judicial review of agency actions where they have been "committed to agency discretion by law"— presumably, the provision applied in *Romeiro*).[4]

We conclude that Mada's challenges based on the APA and the FOIA to the application of the 1981 Operating Instruction in his case are without merit. We conclude that Fitzpatrick properly applied the amended Operating Instruction in reviewing Mada's petition, and that the district court had no authority to remand

Mada's petition to the INS for review under the 1978 Operating Instruction.

## A.   STANDARD OF REVIEW

We review de novo the district court's decision on Mada's petition for writ of habeas corpus. *Reiger v. Christensen*, 789 F.2d 1425, 1427 (9th Cir.1986); *Tatum v. Christensen*, 786 F.2d 959, 963 (9th Cir. 1986); *see also Staatz v. Dupnik*, 789 F.2d 806, 808 (9th Cir.1986). We also review de novo the district court's determinations on issues of statutory interpretation, including the scope of the notice-and-comment and publication requirements imposed by the APA and the FOIA. *See Swanson v. United States*, 789 F.2d 1368, 1370 (9th Cir. 1986); *Sierra Switchboard Co. v. Westinghouse Electric Corp.*, 789 F.2d 705, 707 (9th Cir.1986); *In re Nunn*, 788 F.2d 617, 618 (9th Cir.1986).

## B.   MADA'S CHALLENGE UNDER THE APA

Mada challenges the validity of the 1981 Operating Instruction based on the INS's failure, when it promulgated the amended Instruction, to follow the notice-and-comment procedures prescribed in APA section 553.[5]   The INS's replacement of the origi-

---

4. In *Heckler v. Chaney*, 470 U.S. 821, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985), the Supreme Court indicated that "an agency's decision not to take enforcement action [in a particular case] should be presumed immune from judicial review under [APA] § 701(a)(2)," because such a decision "often involves a complicated balancing of a number of factors which are peculiarly within its expertise," including "whether agency resources are best spent on this violation or another, whether the agency is likely to succeed if it acts, whether the particular enforcement action requested best fits the agency's overall policies, and indeed, whether the agency has enough resources to undertake the action at all." *Id.* at 1656. Although a determination by the INS not to grant deferred action status to a particular alien is not precisely a "decision not to take enforcement action," the 1981 Instruction requires the district director to consider many of the same factors. *See* Operating Instruction 103.1(a)(1)(ii) (1981). Thus, the same reasoning that supported the Supreme Court's decision in *Chaney* would also support the *Romeiro* panel's decision that denials of deferred action status applications are not subject to judicial review.

5. Section 553, the APA's notice-and-comment rulemaking provision, provides that:

  (b) General notice of proposed rule making shall be published in the Federal Register.... The notice shall include—

  (1) a statement of the time, place, and nature of public rule making proceedings;

  (2) reference to the legal authority under which the rule is proposed; and

  (3) either the terms or substance of the proposed rule or a description of the subjects and issues involved.   Except when notice or hearing is required by statute, *this subsection does not apply—*

  (A) to interpretative rules, *general statements of policy,* or rules of agency organization, procedure, or practice....

  (c) After notice required by this section, the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation.   After consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a concise

nal, 1978 version of the Operating Instruction with the 1981 version involves two separate procedural aspects: (1) the repeal of the 1978 Instruction; and (2) the promulgation of the 1981 Instruction. Each of these two agency "actions" constitutes "rulemaking" under the APA, and therefore each action independently triggers section 553's notice-and-comment requirements unless it qualified for one of the exceptions contained in that provision. *See* 5 U.S.C. §§ 551(5) (defining "rule making" under the APA as "agency process for formulating, amending, or *repealing* a rule") (emphasis added), 553(b)-(d); *Consumer Energy Council of America v. FERC*, 673 F.2d 425, 446 & n. 76 (D.C.Cir. 1982) ("the APA expressly contemplates that notice and an opportunity to comment will be provided prior to agency decisions to repeal a rule"), *aff'd sub nom. Process Gas Consumers Group v. Consumer Energy Council of America*, 463 U.S. 1216, 103 S.Ct. 3556, 77 L.Ed.2d 1402, 1403, 1413, *reh'g denied*, 436 U.S. 1250, 104 S.Ct. 40, 77 L.Ed.2d 1457 (1983); *accord Environmental Defense Fund, Inc. v. Gorsuch*, 713 F.2d 802, 816-17 (D.C.Cir.1983); *Brown Express, Inc. v. United States*, 607 F.2d 695, 699 & n. 3 (5th Cir.1979); *Arlington Oil Mills, Inc. v. Knebel*, 543 F.2d 1092, 1098-99 (5th Cir.1976); *National Wildlife Federation v. Clark*, 577 F.Supp. 825, 828 (D.D.C.1984); *see also Motor Vehicle Manufacturers Association of the*

*United States, Inc. v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 41, 51-52, 103 S.Ct. 2856, 2865, 2870-71, 77 L.Ed.2d 443 (1983); *Flores v. Bowen*, 790 F.2d 740, 742 (9th Cir.1986) ("properly enacted regulations have the force of law and are binding on the government until properly repealed").

Fitzpatrick maintains that both the 1978 and the 1981 Operating Instructions qualify for the "general statements of policy" exception contained in section 553. We agree. 5 U.S.C. §§ 553(b)(A), 553(d)(2); *Romeiro*, 773 F.2d at 1025. Therefore, we conclude that the INS was not required under section 553 to conduct notice-and-comment proceedings either to repeal the 1978 Operating Instruction or to promulgate the 1981 Operating Instruction. *Romeiro*, 773 F.2d at 1025.[6]

### 1. The General Statement of Policy Exception

The APA does not define the term "general statements of policy" as it is used in section 553. *See Burroughs Wellcome Co. v. Schweiker*, 649 F.2d 221, 224 (4th Cir. 1981); *Pacific Gas and Electric Co. v. Federal Power Commission*, 506 F.2d 33, 37 (D.C.Cir.1974). However, it is defined in the *Attorney General's Manual on the Administrative Procedure Act*, which was issued in 1947, just after the APA's enactment,[7] as "*statements issued by an agen-*

---

general statement of their basis and purpose....

(d) The required publication or service of a substantive rule shall be made not less than 30 days before its effective date, *except* ...

(2) interpretative rules and *statements of policy....*

5 U.S.C. § 553(b)-(d) (emphasis added).

**6.** Although the two Operating Instructions at issue in this case qualify as "general statements of policy" under section 553, we note that not *all* INS operating instructions would qualify under that exception, as a broad reading of *Romeiro* might suggest. *See generally Romeiro*, 773 F.2d at 1025. Such a conclusion would run contrary to the widely accepted principle that for purposes of analysis under the APA, "[t]he label that an agency chooses to describe its action is 'only indicative and not dispositive, of the agency's intent,' which may be inferred from the forseeable [sic] effect that the rule will have." *Cubanski v. Heckler*, 781 F.2d 1421, 1426

(9th Cir.1986) (citation omitted); *accord Environmental Defense Fund, Inc. v. Gorsuch*, 713 F.2d 802, 816 (D.C.Cir.1983). Agencies cannot exempt their proposed new rules from the APA's notice-and-comment or other requirements merely by classifying them as "operating instructions." Moreover, our review of the law relating to "general statements of policy" leads us to conclude that the availability of this exception from section 553's requirements must be determined on a rule-by-rule basis. *See, e.g., Ryder Truck Lines, Inc. v. United States*, 716 F.2d 1369, 1377-78 (11th Cir.1983), *cert. denied*, 466 U.S. 927, 104 S.Ct. 1708, 80 L.Ed.2d 181 (1984); *Jean v. Nelson*, 711 F.2d 1455, 1478-83 (11th Cir.1983), *rev'd in part as moot*, 727 F.2d 957, 962 (11th Cir.1984) (en banc), *aff'd*, 472 U.S. 846, 105 S.Ct. 2992, 86 L.Ed.2d 664 (1985).

**7.** The Supreme Court has accorded deference to the interpretations of APA provisions contained in the *Attorney General's Manual*, both because

*cy to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power."* Attorney General's Manual on the Administrative Procedure Act 30 n. 3 (1947) (emphasis added); *Guardian Federal Savings and Loan Association v. Federal Savings and Loan Insurance Corp.,* 589 F.2d 658, 666 (D.C.Cir.1978); *see also Pacific Gas,* 506 F.2d at 38. When officials or agencies have been delegated discretionary authority over a given area, such as the Attorney General and the INS in the field of immigration, *see* 8 U.S.C. § 1103 (1982); *Jean v. Nelson,* 711 F.2d 1455, 1466 (11th Cir.1983), *rev'd in part as moot,* 727 F.2d 957, 962 (11th Cir.1984) (en banc), *aff'd,* 472 U.S. 846, 105 S.Ct. 2992, 86 L.Ed.2d 664 (1985); [8] K. Davis, *Administrative Law Treatise* § 8.10 (2d ed. 1979), such policy statements serve a dual purpose. Besides informing the public concerning the agency's future plans and priorities for exercising its discretionary power, they serve to "educate" and provide direction to the agency's personnel in the field, who are required to implement its policies and exercise its discretionary power in specific cases. *See* H. Friendly, *The Federal Administrative Agencies* 145–46 (1962) ("one of the values of the policy statement [is] the education of agency members in the agency's work"), *quoted in Noel v. Chapman,* 508 F.2d 1023, 1030 (2d Cir.), *cert. denied,* 423 U.S. 824, 96 S.Ct. 37, 46 L.Ed.2d 40 (1975); Bonsfield, *Some Tentative Thoughts on Public Participation in the Making of Interpretative Rules and General Statements of Policy Under the APA,* 23 Admin.L.Rev. 101, 115 (1970–71) ("It may be that 'general statements of policy' are rules directed primarily at the staff of an agency describing how it will conduct agency discretionary functions, while other rules are directed primarily at the public in

an effort to impose obligations on them."), *quoted in Noel,* 508 F.2d at 1030.

■ When a federal agency issues a directive concerning the future exercise of its discretionary power, for purposes of APA section 553, its directive will constitute either a substantive rule, for which notice-and-comment procedures are required, or a general statement of policy, for which they are not. *See Pacific Gas,* 506 F.2d at 38; 5 U.S.C. § 553(b)-(d). The critical factor to determine whether a directive announcing a new policy constitutes a rule or a general statement of policy is "the extent to which the challenged [directive] leaves the agency, or its implementing official, free to exercise discretion to follow, or not to follow, the [announced] policy in an individual case." *Jean,* 711 F.2d at 1481; *accord Ryder Truck Lines, Inc. v. United States,* 716 F.2d 1369, 1377 (11th Cir.1983), *cert. denied,* 466 U.S. 927, 104 S.Ct. 1708, 80 L.Ed.2d 181 (1984); *American Mining Congress v. Marshall,* 671 F.2d 1251, 1263 (10th Cir.1982); *Burroughs Wellcome,* 649 F.2d at 224; *Guardian Federal,* 589 F.2d at 666–67.

■ To the extent that the directive merely provides *guidance* to agency officials in exercising their discretionary powers while preserving their flexibility and their opportunity to make "individualized determination[s]," it constitutes a general statement of policy. *Guardian Federal,* 589 F.2d at 666–67; *Noel,* 508 F.2d at 1030; *see Ryder,* 716 F.2d at 1377; *Jean,* 711 F.2d at 1481. In such cases, Congress has determined that notice-and-comment rulemaking would be of limited utility, *see* 5 U.S.C. §§ 553(b)(A), 553(d)(2), and parties can challenge the policy determinations made by the agency only if and when the directive has been applied specifically to them. *See Jean,* 711 F.2d at 1481–82 & n.

it was issued contemporaneously with the passage of the APA and because of the significant role played by the Justice Department in drafting the APA. *See, e.g., Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council,* 435 U.S. 519, 546, 98 S.Ct. 1197, 1213, 55 L.Ed.2d 460 (1978); *see also Pacific Gas and Electric Co. v. Federal Power Commission,* 506 F.2d 33, 38 n. 17 (1974).

**8.** Although the portion of the original panel decision in *Jean* analyzing the "general statement of policy" exception became moot before it was reviewed en banc by the Eleventh Circuit, and therefore is no longer controlling precedent, we find its analysis persuasive and useful in our consideration of the present case.

23; *Pacific Gas*, 506 F.2d at 38. In contrast, to the extent that the directive "narrowly limits administrative discretion" or establishes a *"binding norm"* that "so fills out the statutory scheme that upon application one need only determine whether a given case is within the rule's criterion," it effectively replaces agency discretion with a new "binding rule of substantive law." *Ryder*, 716 F.2d at 1377 (emphasis added); *Jean*, 711 F.2d at 1481; *Guardian Federal*, 589 F.2d at 666–67. In these cases, notice-and-comment rulemaking proceedings are required, as they would be for any other substantive rule, *see* 5 U.S.C. § 553(b), (d), and they will represent the only opportunity for parties to challenge the policy determinations upon which the new rule is based. *See Pacific Gas*, 506 F.2d at 38.[9]

Thus, for the 1978 and 1981 Operating Instructions to qualify under section 553's "general statement of policy" exception, as Fitzpatrick contends, they must satisfy two requirements. First, they must operate only prospectively. *Burroughs Wellcome*, 649 F.2d at 224; *Iowa Power and Light Co. v. Burlington Northern, Inc.*, 647 F.2d 796, 811 (8th Cir.1981), *cert. denied*, 455 U.S. 907, 102 S.Ct. 1253, 71 L.Ed.2d 445 (1982); *American Business Association v. United States*, 627 F.2d 525, 529–31 (D.C. Cir.1980); *Mast Industries, Inc. v. Regan*, 596 F.Supp. 1567, 1579 (Ct.Int'l Trade 1984); *Attorney General's Manual*, at 30 n. 3. *But cf. Jean*, 711 F.2d at 1478–79 (suggesting that general statements of policy need not operate exclusively in the future); K. Davis, *Administrative Law Treatise* § 7.5, at 169–70. Second, they must

not establish a "binding norm" or be "finally determinative of the issues or rights to which [they are] addressed," but must instead leave INS officials "free to consider the individual facts in the various cases that arise." *Ryder*, 716 F.2d at 1377; *Jean*, 711 F.2d at 1481 & n. 21; *American Mining Congress*, 671 F.2d at 1263; *Burroughs Wellcome*, 649 F.2d at 224; *Iowa Power and Light*, 647 F.2d at 811; *American Business Association*, 627 F.2d at 529–30; *Guardian Federal*, 589 F.2d at 666–67; *Pacific Gas*, 506 F.2d at 38; *Mast Industries*, 596 F.2d at 1579; *see American Trucking Associations, Inc. v. ICC*, 659 F.2d 452, 463, 474 (5th Cir.1981), *cert. denied*, 460 U.S. 1022, 103 S.Ct. 1272, 75 L.Ed.2d 493 (1983). We conclude that the 1978 and 1981 Operating Instructions satisfy both these requirements.

We note that two considerations that Mada relies upon to establish that the 1978 and 1981 Operating Instructions do not constitute general statements of policy are not determinative of the issue. First, Mada appears to assume that if an agency's decisions applying a particular regulation are reviewable by courts, then the regulation must automatically be a substantive rule for which notice-and-comment rulemaking procedures are required. Thus, he maintains that our decision in *Nicholas*, 590 F.2d at 802, holding that the 1978 Operating Instruction created judicially enforceable rights, necessarily implies that the 1978 Instruction was not merely a general statement of policy.

The determinations of whether an agency's decisions implementing a particular directive are subject to judicial review and

---

**9.** In *Pacific Gas and Electric Co. v. Federal Power Commission*, 506 F.2d 33 (D.C.Cir.1974), the D.C. Circuit explained the difference between substantive rules and general statements of policy as follows:

A properly adopted substantive rule establishes a standard of conduct which has the force of law. In subsequent administrative proceedings involving a substantive rule, the issues are whether the adjudicated facts conform to the rule and whether the rule should be waived or applied in that particular instance. The underlying policy embodied in the rule is not generally subject to challenge before the agency.

A general statement of policy, on the other hand, does not establish a "binding norm." It is not finally determinative of the issues or rights to which it is addressed. The agency cannot apply or rely upon a general statement of policy as law because a general statement of policy only announces what the agency seeks to establish as policy. A policy statement announces the agency's tentative intentions for the future. When the agency applies the policy in a particular situation, it must be prepared to support the policy just as if the policy statement had never been issued.

*Id.* at 38 (citations omitted).

whether the directive itself constitutes a general statement of policy exempt from section 553's notice-and-comment requirements are not necessarily interdependent. The two issues involve different statutory provisions, are analyzed under different standards, and arise at different chronological stages of a directive's history.

To qualify as a general statement of policy under section 553, as noted above, a directive must not establish a "binding norm" and must leave agency officials "free to consider the individual facts in the various cases that arise" and to exercise discretion. *Ryder*, 716 F.2d at 1377. In contrast, for an agency's action pursuant to a particular directive to be unreviewable by the courts under APA section 701(a)(2), it is not alone sufficient that the action involves agency discretion; courts must also have "no meaningful standard against which to judge the agency's exercise of discretion.... [or] to evaluate [it] for 'abuse of discretion.'" *Heckler v. Chaney*, 470 U.S. 821, 105 S.Ct. 1649, 1655, 84 L.Ed.2d 714 (1985); *see Western Medical Enterprises, Inc. v. Heckler*, 783 F.2d 1376, 1380 (9th Cir.1986) (discretionary decisions by agencies are not subject to judicial review under section 701(a)(2) only " 'in those rare instances where "statutes [or regulations] are drawn in such broad terms that in a given case there is no law to apply" ' ") (quoting *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 410, 91 S.Ct. 814, 821, 28 L.Ed.2d 136 (1971)) (other citations omitted); *Abdelhamid v. Ilchert*, 774 F.2d 1447, 1449 (9th Cir.1985) (acknowledging that " 'even under statutes [or regulations] granting an official the broadest discretion, there will be some [cases] arising [for] which the court will ... "have law to apply" ' " and that will therefore be judicially reviewable) (quoting *Strickland v. Morton*, 519 F.2d 467, 470 (9th Cir.1975) (citations omitted)).

▉ Moreover, the determination that a directive constitutes a general statement of policy is binding in future cases, and is based exclusively upon the language and structure of the directive itself. *See, e.g., Ryder*, 716 F.2d at 1377. In contrast, determination of whether agency actions implementing that directive are reviewable under section 701(a)(2) must be made on a case-by-case basis, and are made only after the agency has applied the directive in a particular situation and a specific complaint has been filed. *See Abdelhamid*, 774 F.2d at 1449 (quoting *Strickland*, 519 F.2d at 470). ( [T]he test ... of when a reviewing court lacks jurisdiction due to [section] 701(a)(2), is not whether a statute viewed in the abstract lacks law to be applied, but rather, whether *"in a given case"* there is no law to be applied.') (citing *Overton Park*, 401 U.S. at 410, 91 S.Ct. at 821) (emphasis in original); *accord Abdelhamid*, 774 F.2d at 1449 (determination under section 701(a)(2) must be made "in the context of a particular complaint").

▉ Because of these differences between section 553 and section 701(a)(2), courts confronted with claims based on the two provisions have tended to address and analyze them separately. *See, e.g., Noel*, 508 F.2d at 1029–30; *see also Alaniz v. Office of Personnel Management*, 728 F.2d 1460, 1463–64, 1467–69 (Fed.Cir.1984); *Iowa Power and Light*, 647 F.2d at 811–12 (implicitly finding agency decision reviewable under section 701(a)(2)). Furthermore, several courts have suggested that agency decisions made pursuant to general statements of policy may be judicially reviewable at least for abuse of discretion. *See Jean*, 711 F.2d at 1481–82 & n. 23; *Pacific Gas*, 506 F.2d at 38–40. For all these reasons, we conclude that our decision in *Nicholas*, finding determinations made pursuant to the 1978 Operating Instruction reviewable, does not foreclose the possibility that the 1978 Instruction constitutes a general statement of policy for purposes of section 553.[10]

---

10. Our ruling in *Nicholas* illustrates the distinction between two discrete issues: (1) whether an agency directive preserves sufficient discretion for agency decisionmakers to constitute a general statement of policy under section 553 and (2) whether agency decisions implementing that directive are reviewable in the courts in light of section 701 (a)(2). In *Nicholas*, we concluded that the 1978 Operating Instruction vested "wide discretion" in INS district directors to make

Second, Mada apparently assumes that the 1978 Instruction cannot constitute a general statement of policy under section 553 because the INS's replacement of the 1978 Operating Instruction with the 1981 Instruction diminishes the likelihood that he and other similarly situated aliens will be granted deferred action status, and eliminates their opportunity to obtain judicial review. In essence, Mada suggests that if the repeal of an agency directive will cause a "substantial impact" to the rights of a specific class it cannot be exempt from section 553's notice-and-comment requirements. However, we have expressly "rejected the argument that, for the purposes of imposing notice-and-comment requirements on [an] agency for a particular rule, [courts should] look to the 'substantial impact' of the rule." *Alcaraz v. Block*, 746 F.2d 593, 613 (9th Cir.1984) (citations omitted); *accord Rivera v. Becerra*, 714 F.2d 887, 890–91 (9th Cir.1983), *cert. denied*, 465 U.S. 1099, 104 S.Ct. 1591, 80 L.Ed.2d 124 (1984); *see Southern California Edison Co. v. FERC*, 770 F.2d 779, 783 (9th Cir. 1985). We have concluded that " '[s]imply because agency action has substantial impact does not mean it is subject to notice and comment if it is otherwise expressly exempt under the APA.' " *Alcaraz*, 746 F.2d at 613 (citations omitted); *accord Rivera*, 714 F.2d at 890–91 (citing the Supreme Court's admonition in *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council*, 435 U.S. 519,

524, 98 S.Ct. 1197, 1202, 55 L.Ed.2d 460 (1978), that courts should not impose procedural requirements upon agencies beyond those expressly provided in the APA); *contra United States Department of Labor v. Kast Metals Corp.*, 744 F.2d 1145, 1153–54 & n. 19 (5th Cir.1984) (adopting a more limited interpretation of *Vermont Yankee's* admonition).

In determining whether particular regulations or directives qualify for one of section 553's exemptions from notice-and-comment requirements, we have focused upon the effect of the regulation or directive upon *agency decisionmaking*, not the public at large.[11] *See, e.g., Southern California Edison*, 770 F.2d at 783 (discussing "rules of agency organization, procedure, or practice"); *Alcaraz*, 746 F.2d at 613 (discussing interpretative rules); *but cf.* Note, *An Analysis of the General Statement of Policy Exception to Notice and Comment Procedures*, 73 Georgetown L.J. 1007 (1985) (arguing that "substantial impact" test should be applied in conjunction with the "binding norm" test to determine whether a directive constitutes a general statement of policy.) Therefore, to the extent that the 1978 and 1981 Operating Instructions satisfy the two requirements noted above—operating prospectively and not establishing a "binding norm" they constitute general statements of policy for purposes of section 553.

---

deferred action determinations, but nevertheless ruled that we could review those determinations for abuse of discretion based upon the factors enunciated in the Instruction and the facts of each individual case. *Nicholas*, 590 F.2d at 807–08. We concluded, based upon the language of the 1978 Instruction, that district directors were required to "fully and fairly weigh[ ]" the facts of each case, and that if they found "the relevant humanitarian factors [to be] compelling," they were required to recommend deferred action status: this provided a basis for judicial review. *Id.* at 807.

Thus, we recognized in *Nicholas* that even when regulations accord an agency "wide discretion" in making certain determinations, the agency's exercise of its discretion may still be subject to judicial review under section 701(a)(2) if there are "meaningful" and "judicially manageable standards" for evaluating its decisions. *Heckler v. Chaney*, 470 U.S. 821, 105

S.Ct. 1649, 1655, 84 L.Ed.2d 714 (1985). As a result, our ruling in *Nicholas* that INS decisions applying the 1978 Instruction are subject to judicial review is not inconsistent with our ruling in the present case that the 1978 Instruction does not establish a "binding norm" and constitutes a general statement of policy under section 553.

**11.** Because many general statements of policy have a substantial impact, *see Jean*, 711 F.2d at 1480, broad application of the "substantial impact" test could well obliterate much of the "general statement of policy" exception to the APA's notice-and-comment procedures. We conclude that Congress could not have intended such a result, given the structure of section 553 and its use of classifications like "general statement of policy," which focus upon the effect a directive has upon agency decision-making, rather than the effect on the public at large.

### 2. The 1978 Operating Instruction

Applying these two requirements to the 1978 Operating Instruction, we conclude that it constituted a general statement of policy, and thus could be validly repealed and superseded without notice-and-comment proceedings.[12] The 1978 Instruction operated only prospectively, and did not establish a "binding norm" that would limit the district director's discretion. The Instruction expressly authorizes the district director "to consider [any] individual facts" that he may feel appropriate in addition to the five enumerated factors in the instruction. *See Ryder*, 716 F.2d at 1377. It requires him to evaluate whether deporting or excluding an individual petitioning for deferred action status "would be *unconscionable* or result in *undue hardship* because of the existence of *appealing humanitarian factors*": these terms allow for great agency latitude and discretion, and cannot be viewed as establishing a "binding norm." *See Jean*, 711 F.2d at 1482 n. 23 (suggesting that a standard that permits the granting of relief in cases where there are "significant humanitarian reasons" is "so broad that the agency official is free to grant relief" and is not constrained in his discretion). As a result, we conclude that the 1978 Operating Instruction constitutes a general statement of policy under section 553, and could be repealed validly without notice-and-comment proceedings.

### 3. The 1981 Amended Operating Instruction

We conclude that the 1981 Operating Instruction presents even a clearer case of a general statement of policy. Like the 1978 Operating Instruction, it operates only prospectively. Moreover, the wording and structure of the amended Instruction emphasizes the broad and unfettered discretion of the district director in making deferred action determinations. None of the factors listed in the 1981 Instruction establishes a "binding norm": they require the district director to evaluate the "sympathetic" appeal of the deferred action applicant and to surmise the possible internal agency reaction and publicity that would result from his deportation and exclusion. The Instruction leaves the district director "free to consider the individual facts" in each case. *Ryder* 716 F.2d at 1377. We conclude as a result, that the 1981 Operating Instruction constitutes a general statement of policy, and was validly promulgated without notice-and-comment proceedings. *See* 5 U.S.C. §§ 553(b)(A), 553(d)(2).

Because we conclude that notice-and-comment proceedings were not required under section 553 either to repeal the original, 1978 Operating Instruction or to promulgate the 1981 Operating Instruction, we reject Mada's challenge to the denial of his deferred action petition based upon the APA.

### C. MADA'S CHALLENGE UNDER THE FOIA

Mada also contends that the 1981 version of the Operating Instruction is invalid, or at least should not be applied in his case, because the INS failed to publish it in the Federal Register, as required under FOIA sections 552(a)(1)(D) and (E).[13]

---

**12.** The 1978 Operating Instruction was promulgated without notice-and-comment proceedings, and the INS contends that because of this, either the Instruction *per se* cannot be a substantive rule, or that even if it is substantive, the Instruction can always be repealed in the same manner it was promulgated.

Because we conclude that the 1978 Instruction was a general statement of policy and therefore could be validly promulgated and repealed without notice-and-comment proceedings, we need not answer the INS's contention directly. However, we note that when the government seeks to repeal a regulation, it is generally not bound for section 553 purposes by the way it classified that regulation at the time

of its promulgation. *See Washington Hospital Center v. Heckler*, 581 F.Supp. 195, 199 (D.D.C. 1984). Therefore we would question whether private citizens like Mada should be estopped from asserting that a regulation being replaced is substantive, simply because they and other parties did not assert such a position at the time the regulation was promulgated—particularly since asserting such a position would have been directly contrary to their interest.

**13.** The Freedom of Information Act (FOIA), 5 U.S.C. § 552(a)(1), imposes the following publication requirements upon federal agencies:

We rejected this precise claim in *Romeiro*,[14] concluding that the 1981 Operating Instruction "clearly does not create substantive rights" for aliens, *Romeiro*, 773 F.2d at 1025 n. 3, and therefore the failure to publish it did not "'adversely affect a member of the public.'" *Zaharakis v. Heckler*, 744 F.2d 711, 714 (9th Cir.1984) (citation omitted), *accord Cubanski v. Heckler*, 781 F.2d 1421, 1428–29 (9th Cir.1986). As a result, we held that no individual, including the plaintiff in *Romeiro*, can challenge the INS's failure to publish the 1981 Instruction under the FOIA. *See Romeiro*, 773 F.2d at 1025 n. 3; *see also Cubanski*, 781 F.2d at 1428–29; *Zaharakis*, 744 F.2d at 714. The FOIA explicitly provides that an individual cannot object to the application of an unpublished rule in his case if he has "actual and timely notice of [its] terms." 5 U.S.C. § 552(a)(1). We have previously held that an individual may not raise an FOIA claim based on an agency's failure to publish a rule or regulation, unless he makes an "initial showing" that "he was adversely affected by the lack of publication or that he would have been able to pursue an alternate course of conduct" had publication occurred. *Zaharakis*, 744 F.2d at 714; *accord Cubanski*, 781 F.2d at 1428–29; *see also United States v. Hall*, 742 F.2d 1153, 1155 (9th Cir.1984). The record indicates that Mada was aware of the precise language of the 1981 Operating Instruction when he first petitioned for deferred action status in October, 1983. His petition expressly quoted the "sympathetic factors" language contained in the 1981 Instruction. Moreover, he has not alleged that he could somehow have altered his conduct in a material way had he been aware of the amended Instruction sooner. Thus, for all these reasons we must reject Mada's claim that the 1981 Operating Instruction should not be applied in his case because of the INS's failure to publish it in the Federal Register. *See Romeiro*, 773 F.2d at 1025 n. 3; *Zaharakis*, 744 F.2d at 714; *see also Cubanski*, 781 F.2d at 1428–29.

## CONCLUSION

We reject Mada's challenges to the promulgation and application of the 1981 Operating Instruction in his case based on the APA and the FOIA. We conclude that Fitzpatrick properly reviewed Mada's petition for deferred action status under the 1981 Operating Instruction. As a result, we reverse the district court's grant of Mada's habeas petition, and remand this action to the district court for proceedings consistent with this opinion.

**REVERSED and REMANDED.**

IRVING HILL, District Judge (specially concurring):

I concur in the result reached by the majority. Regretfully I cannot concur in the opinion.

As the majority concedes, we must reverse and remand the instant case on the authority of *Romeiro De Silva v. Smith*, 773 F.2d 1021 (9th Cir.1985). A short opinion so stating would be more in order than the lengthy discourse—almost a mini-treatise—on administrative law set forth in the majority opinion.

In many ways the majority seems to ignore the fact that the *Romeiro* opinion is

---

Each agency shall separately state and currently publish in the Federal Register for the guidance of the public ...

(D) substantive rules of general applicability adopted as authorized by law, and *statements of general policy* or interpretations of general applicability formulated and adopted by the agency; and

(E) each amendment, revision, or repeal of the foregoing.

Except to the extent that a person has *actual and timely notice of the terms thereof*, a person may not in any manner be required to resort to, or be adversely affected by, a matter required to be published in the Federal Register and not so published.

5 U.S.C. § 552(a)(1)(D)–(E) (emphasis added).

**14.** The fact that the 1981 amended Operating Instruction constitutes a "general statement of policy" under the APA does not exempt it from the FOIA's publication requirement. The FOIA explicitly requires that agencies publish their "statements of general policy" in the Federal Register. 5 U.S.C. § 552(a)(1)(D); *Cubanski v. Heckler*, 781 F.2d 1421, 1428 (9th Cir.1986); *Zaharakis v. Heckler*, 744 F.2d 711, 714 (9th Cir. 1984).

on the books. It is, in my view, misleading, even if technically accurate, to assert that we can and do review "de novo" the "district court's determination on issues of statutory interpretation including the scope of the notice-and-comment and publication requirements imposed by the APA and the FOIA." *See* opinion Subsection A, "Standard of Review". As concerns any statutory interpretation made by a trial court, this court's review is, of course, "de novo". But as concerns the questions of statutory interpretation involved in this case, including the questions concerning the notice-and-comment and publication requirements imposed by the APA and the FOIA, our review is not, and cannot be, de novo. In my view, those matters have already been decided for this Circuit in *Romeiro*.

I am troubled by the language of the majority opinion in which the majority "conclude", after a lengthy discussion and analysis of the general statement of policy exception in 5 U.S.C. § 553, that both the 1978 and 1981 Operating Instructions "satisfy [the] requirements" of the exception. In my view, the holding that both Operating Instructions met the requirements of the exception was made in *Romeiro*. As to the 1981 Operating Instruction, the *Romeiro* holding is explicit (773 F.2d at 1025 (1st col.)). As to the 1978 Operating Instruction, the *Romeiro* holding is clearly implicit because Romeiro had argued that the 1978 Operating Instruction was of such stature and dignity that it could not be validly superceded or repealed by a later instruction promulgated without the publication requirements of Section 553. The *Romeiro* court flatly rejected this argument. We are bound by *Romeiro*. Ours is not to "conclude" that *Romeiro* was (or was not) correctly decided. Therefore, my objection to the majority's discussion of the general statement of policy exception (and particularly the extended analysis of its requisites and limitations) is that this discussion is dicta.

I am also troubled by the majority's extensive discussion of the judicial reviewability of administrative decisions. In my view, that entire discussion is unnecessary to the decision of this case and is therefore also pure dicta. The instant case gets down to only one issue, i.e., whether the 1981 Operating Instruction was validly adopted. That is the only issue because Mada has conceded that (1) his petition was adjudicated under the 1981 Operating Instruction, and (2) if the 1981 Operating Instruction was validly adopted, he has no standing to complain about the decision which the Director reached in this case.

The dicta uttered by the majority on both matters, the Section 553 exclusion and reviewability, include many broad and sweeping statements. Once set loose into the stream of judicial opinions, such dicta are often quoted and used to decide future cases. These particular dicta ought not to be so used and we should not, by authoring them, take the risk that they will be so used. The question of which administrative actions are judicially reviewable, and which are not, was scarcely briefed in this case. There was no briefing of the distinction, enunciated by the majority, between judicial reviewability, on the one hand, and the notice-and-comment requirements on the other.

All of these dicta deal with important questions which will surely and squarely arise in future cases. The future consideration of these matters ought not to be influenced by dicta pronounced unnecessarily and without full briefing.

The Supreme Court has aptly stated in *United States and Interstate Commerce Commission v. Alaska Steamship Company*, 253 U.S. 113, 116, 40 S.Ct. 448, 449, 64 L.Ed. 808.

> [I]t is a settled principle in this court that it will determine only actual matters in controversy essential to the decision of the particular case before it ... [T]his court 'is not empowered to decide moot questions or abstract propositions, or to declare, for the government of future cases, principles or rules of law which cannot affect the result as to the thing in issue in the case before it.' [Citations].

It is, in a sense, unfortunate that another panel of this court decided *Romeiro* after the instant case was argued to us and that

the *Romeiro* opinion decided all of the important questions which we are called upon to decide. Thus, we were deprived of the opportunity and excuse for a far-ranging comprehensive opinion on various areas of administrative law. Additionally, there are some areas of murkiness in the *Romeiro* opinion which would benefit from amplification and clarification. But none of those circumstances justify the type and extent of the dicta involved in the majority opinion. My deep commitment to judicial self-restraint in opinion writing has not changed over the years. *See* my concurring opinion in *General Insurance Company of America v. Equal Employment Opportunity Commission*, 491 F.2d 133 (9th Cir.1974), at p. 136.